FIRST DIVISION

September 28, 2001 

No. 1-00-2383

REGINALD REED, ) Appeal from the 

 ) Circuit Court of 

Plaintiff-Appellant, ) Cook County

 )

v. ) 

 ) No. 96 L 0607

JACKSON PARK HOSPITAL FOUNDATION, ) 

IVY SANDIFER, LARRY MITCHELL, )   

AND MEDICAL EMERGENCY CARE ASSOCIATES, ) 

S.C., an Illinois Corporation, ) The Honorable

) Barbara J. Disko,

Defendants-Appellees. ) Judge Presiding.

JUSTICE COUSINS delivered the opinion of the court:

Reginald Reed filed a medical malpractice action against Jackson Park Hospital Foundation (JPH), Dr. Ivy Sandifer, Dr. Larry Mitchell, and Medical Emergency Care Associates (MECA) seeking damages for the loss of his right eye.  Prior to trial, the trial court granted defendants' motion 
in
 
limine
 to bar the testimony of plaintiff's expert witness.  JPH, Dr. Mitchell, and MECA then moved for summary judgment on the basis that, without the expert witness' testimony, plaintiff could not prove the proximate cause element of his case.  The trial court granted the motion for summary judgment.  Plaintiff-appellant appeals from the order of the circuit court entered against him that granted defendants' motion for summary judgment. The primary issues upon appeal are:  (1) whether the circuit court erred in ruling, pursuant to defendants' motion 
in
 
limine
, 
to bar the opinion of plaintiff's expert witness; and (2) whether, under the "lost chance" doctrine, the court erred in granting defendant's renewed motion for summary judgment.

BACKGROUND

On the evening of July 3, 1995, plaintiff was assaulted by unknown assailants in the 6500 block of South Kimbark in Chicago, Illinois.  Plaintiff was hit in the head and right eye with "stick."  He was transported to Jackson Park Hospital where he received emergency care.  Dr. Larry Mitchell treated plaintiff in the JPH emergency room.  Plaintiff received stitches on the back of his head and on his right eyelid and was released on July 4, 1995.  He was instructed to return to the emergency room as needed, to return in three days to have his wounds checked, and to return in seven days to have his stitches removed.  Plaintiff recalls that his right eye was not bandaged but it was swollen shut.  

On July 4, 1995, plaintiff's girlfriend said to him, "Your eye is bleeding."  Plaintiff's mother made a similar observation on July 6, 1995.  Plaintiff testified that he did not look at the fluid or return to the hospital after being told about the leakage.  

On July 7, 1995, plaintiff went to Veteran's Administration (VA) hospital, where he was told, "You're going to have to have surgery."  He was then examined by Dr. Alice Lyon and third-year resident, Dr. Leonard Gurevich.  Dr. Lyon was the attending physician that supervised Dr. Gurevich.  They found lacerations on plaintiff's eye.  It was determined that the eye could not be saved.  Plaintiff's right eye was removed on July 11, 1995.   Plaintiff testified that an unidentified doctor told his mother that "maybe" his eye could have been saved had there been other action in his initial hospital visit.  Plaintiff received a prosthetic eyeball in October 1995.

In January 1996, plaintiff filed a complaint against JPH, Dr. Larry Mitchell, and Dr. Ivy Sandifer alleging medical malpractice and seeking damages for the loss of his right eye due to defendants' alleged medical malpractice.  Plaintiff later amended his complaint to add MECA.  Dr. Sandifer was later dismissed.  Plaintiff's first amended complaint alleged that Dr. Ivy Sandifer, Dr. Larry Mitchell, and MECA failed to use reasonable care in examining and treating plaintiff's right eye.  Defendants denied all material allegations of negligence.  Plaintiff ultimately asserted that defendants were liable under the "lost chance" doctrine.

During deposition, Dr. Leonard Gurevich testified that he was board certified in ophthalmology in 1997.  He first saw plaintiff on July 7, 1995, as a patient at the VA hospital.  Dr. Gurevich was a third-year resident in ophthalmology and the chief resident at that time.  Dr. Gurevich's July 8, 1995, examination of plaintiff revealed that plaintiff had a "ruptured globe[,] *** a hyphema, which is blood in the antechamber, and revealed a lot of swelling of the lids."  The following testimony was elicited during Dr. Gurevich's evidence deposition:

   "MR. RABINOWITZ [plaintiff's attorney]: Do you have an opinion, based upon a reasonable degree of medical certainty, as to whether or not, as of July 7th, of 1995, the eye could have been saved?

   THE WITNESS [Dr. Gurevich]: I don't think with medical certainty, the eye could have been saved.

   Q. Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, if the injury to the eye was discovered on July 3rd-- on the evening of July 3rd or July 4th, is it more probable that the eye could have been saved?

* * *

   THE WITNESS: No, I don't think to the medical degree of certainty the eye could have been saved.

* * *

   MR. RABINOWITZ: Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, that if the injury to the eye-- that if the injury to the eye had been discovered in the emergency room, would you have had a better chance of saving the eye than on July 7th of 1995?

***

   THE WITNESS: Yes, I think that's reasonable to say.

   MR. RABINOWITZ: And what is the basis for your opinion, Doctor?

   THE WITNESS: The basis is that as time went by and as the wound maintained, or was being opened, and as the eye structures continued to be protruding, some of those eye vital structures perhaps could have been saved, but as the time went by, that eliminated what little chance that existed.

* * *

   MR. RABINOWITZ: And do you have an opinion what effect the, you know, the effect of time, from July 3rd to July 7th, would have had on the corneal laceration?

* * *

   THE WITNESS: Probably not.

   MR. RABINOWITZ: So there probably would have been no effect on the laceration?

   A. Correct. 

* * *

   MR. RABINOWITZ: Okay.  Doctor, at the time of the surgery on July 7th, what was the condition of the uveal tissues?

   THE WITNESS: The uveal tissues were prolapsed into the corneosclera laceration or the wound.

   Q. And what effect would that have on vision?

   A. That would have adverse effect on vision.

   Q. And is that one of the reasons why you recommended the enucleation?

   A. Yes, that's one of the reasons.

   Q. What effect would the time period from July-- in your opinion, based on a reasonable degree of medical certainty, what effect could the time period between July 3rd and the operation of July 7th have had on those uveal structures?

* * *

   THE WITNESS: As the eyeball is opened and as the uveal tissues are prolapsed, the time has adverse effect on survival of those tissues.

* * *

   MR. RABINOWITZ: Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, if the surgical treatment was given on the evening of July 3rd or July 4th, as opposed to July 7th, could the treatment have been more effective.

   THE WITNESS: Yes, I think that's a fair statement to say.

   MR. RABINOWITZ: And what do you based that on?

   THE WITNESS: Again, based on the fact that as time went by, the uveal tissues perhaps may have been saved in terms of repositing it back into the eye, as well as any bleeding that may have occurred with time, which could further damage the nerve and the vital organs of the eye. 

* * *

   MR. RABINOWITZ: Doctor, do you have an opinion, based upon a reasonable degree of medical certainty, on the percentage you would have had a better chance to save the eye if surgery had been performed on July 3rd or 4th instead of July 7th?

   A. I believe I testified in the beginning that it was a twenty percent chance.

   Q. And why is that, Doctor?

   A. Well, I felt that if the injury had been addressed in a timely manner, perhaps there was a small chance that the eye would have been sutured and/or the fact that some of the organs of the eye, the uveal tissue, may have been reposited into the eye."

Further testimony was elicited during Dr. Gurevich's deposition: 

   "MR.CAMARRA [defense counsel]: Would you agree with me that given the trauma in the ruptured globe, which Mr. Reed sustained in this particular case as a result of the trauma that was administrated to him during this beating, that more probably true than not, based upon a reasonable degree of medical and scientific certainty, that the outcome, i.e.,
 
the loss of his eye, would have occurred whether it was diagnosed on July 3 or July 7?

   A. Yes, I agree with that statement.

   Q. With regard to this opinion that you have given Mr. Rabinowitz, that there was a potential of twenty percent chance of saving the eye had the diagnosis been made on July 3 as opposed to July 7, would you agree with me that that's just a number you picked out of the air? You have no basis for that number, correct?

   A. Well, to some degree, I would agree with that, but not entirely.

   Q. Let me go further.  In reaching that opinion, it would be fair to say that you don't know the condition of this gentleman's eye when he actually was in the emergency room on the evening of July 3 and the morning of July 4, is that fair?

   A. Fair.

* * *

   Q. Without being able to examine Mr. Reed at the time of the trauma, when it was still fresh, would you agree with me that any opinion you have reached, with regard to the potential for saving his eye, is based to a certain degree on assumption and speculation?

   A. Correct.

* * *

   MR. BREAM [defense counsel]: Now, just so that I'm clear on this point, you would agree with me, wouldn't you, that more probably true than not, if this patient had undergone surgery on July 4th, 1995, the outcome would have been the same?

   THE WITNESS: True.

   Q. You would agree with me, wouldn't you, that you can't say, as you sit here today, to a reasonable degree of medical certainty, that any alleged delay in treatment lessened the effectiveness of treatment for this eye?

   A. True."

Discovery depositions were also taken of Dr. Jay and Dr. Lyon.  Dr. Jay stated that he was given plaintiff's emergency room records from JPH and Dr. Gurevich's deposition and was asked to render an opinion on the standard of care given to plaintiff.  Dr. Jay testified that assuming plaintiff had a corneoscleral laceration at the time of his treatment at JPH and that this had been diagnosed at the time of the emergency room care, plaintiff would have sustained the same outcome, a loss of his right eye.  Dr. Jay stated that he had no opinion as to whether the emergency room physician should have opened plaintiff's eye or as to whether he should have ordered an ophthalmological consult regarding the injury.  He stated, "This is really in the realm of the emergency room physicians which I have no expertise in."  Dr. Jay testified that "the damage of the globe was so extensive at the time of the initial injury that the eye was unsalvageable immediately after the trauma."  Dr. Jay further testified that the timing of the surgery would not have affected the outcome given the extent of the injury.

Dr. Lyon was the attending physician and Dr. Gurevich's supervisor when plaintiff was treated at VA hospital.  Dr. Lyon stated in her deposition that she did not read the records from JPH, but briefly reviewed those from VA hospital.  Prior to plaintiff's exploratory surgery, Dr. Lyon stated that she informed plaintiff and his family that, based upon the condition of his eye, the likelihood of any useful vision or any vision at all was very small.  After the exploratory surgery of plaintiff's right eye, Dr. Lyon determined that there was a very extensive laceration of plaintiff's eye that involved a significant portion of the sclera, retina, and uveal.  She was unable to completely suture the full line of the laceration and she gave "very significant thought to enucleation [removal]."   Dr. Lyon did not perform the enucleation of plaintiff's eye.  The eye was removed by another retinal surgeon.  Dr. Lyon would not opine as to whether surgical intervention would have made a difference in plaintiff's outcome.

Dr. Mitchell of JPH and MECA filed a motion for summary judgment in September 1997.  Defendants' first motion was denied in May 1998 by Judge Michael J. Hogan.  Defendants' second motion was denied by Judge Sophia Hall. 

The affidavit of Dr. David Farkas was attached to plaintiff's March 1998 response to defendant's motion for summary judgment.  The affidavit indicated that JPH and Dr. Mitchell were negligent and did not comply with the requisite standard of care in failing to:  attempt to examine plaintiff's eye; order appropriate diagnostic studies; and order radiographs of the facial bones or orbits. 

 In June 2000 this matter was assigned to Judge Barbara Disko.  Dr. Mitchell, MECA and JPH filed motions 
in
 
limine
 to bar the testimony of Dr. Gurevich on the issue of proximate cause.  Jackson Park Hospital also filed a motion to renew its motion for summary judgment.  After oral argument, the court granted the defendants' motion 
in
 
limine
 and the renewed motions for summary judgment.  The court stated, "I don't believe the opinions that [Dr. Gurevich] gave are reliable or legally sufficient to establish proximate cause or to meet the [
Holton
] standard; therefore, the motion will be granted."  Dr. Gurevich was "barred from offering opinion testimony at the time of trial as to whether any act or omission proximately caused any injury to the Plaintiff."  Based on the bar of testimony, the court also granted defendants' motion for summary judgment finding no genuine issue of material fact and dismissed plaintiff's cause of action "against all defendants, with prejudice."  Plaintiff now appeals seeking vacation or reversal of the trial court's order with remandment.

We affirm.

ANALYSIS

I

Plaintiff in the instant case contends that the trial court erred in barring Dr. Gurevich's testimony.  Plaintiff reasons that, "Since Dr. Gurevich is a qualified ophthalmologist who based his opinion of proximate cause on his knowledge, examinations and findings concerning the Plaintiff, the opinions expressed by Gurevich were reliable."  JPH responds that Dr. Gurevich's testimony was speculative and properly barred by the trial court.  Dr. Mitchell asserts that Dr. Gurevich's testimony was based on "nothing more than guess and speculation."  

The plaintiff in a medical malpractice case must establish:  (1) the relevant standard of care; (2) that the defendant deviated from the standard of care; and (3) that the deviation was a proximate cause of the plaintiff's injury.  
Saxton v. Toole
, 240 Ill. App. 3d 204, 210, 608 N.E.2d 233 (1992).  Plaintiff sustains his burden by proving, generally through expert testimony, that defendant's breach of the applicable standard of care is more probably than not the cause of plaintiff's injury.  
Borowski v. Von Solbrig
, 60 Ill. 2d 418, 424, 328 N.E.2d 301 (1975).  The causal connection may not be contingent, speculative, or merely possible.  
Saxton
, 240 Ill. App. 3d at 210-11. 

Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence.  See 
Grant v. Petroff
, 291 Ill. App. 3d 795, 801, 684 N.E.2d 1020 (1997).  The decision of whether to admit expert testimony is within the sound discretion of the trial court (
People v. Miller
, 173 Ill. 2d 167, 187, 670 N.E.2d 721 (1996)), and a ruling will not be reversed absent an abuse of that discretion (
People v. Reid
, 179 Ill. 2d 297, 313, 688 N.E.2d 1156 (1997)).

The issue at hand in the instant case is whether the circuit court erred in barring the opinion of Dr. Gurevich.  An instructive case is 
Balzekas v. Looking Elk
, 254 Ill. App. 3d 529, 532, 627 N.E.2d 84 (1993).  In that case, the trial court excluded all evidence that indicated that the decedent had throat cancer, that his life expectancy would be decreased when compared to the general population, and his smoking and surgical history.  Defendants wished to present the testimony of decedent's emergency room doctor.  
Balzekas
, 254 Ill. App. 3d at 534.  The trial court excluded his testimony finding that it was not specific enough to justify its admission.  One of the defendants' arguments upon appeal was that the trial court erred in excluding the doctor's statements that the decedent's life expectancy was lower than the average for a male person of similar age.  
Balzekas
, 254 Ill. App. 3d at 532.  The appellate court held that the trial court correctly found that the proffered testimony of the doctor was "too vague and uncertain to justify its admission."  
Balzekas
, 254 Ill. App. 3d at 534.  The court reasoned that the doctor would not have had access to the type of information that would be necessary for him to accurately evaluate the decedent's long-term prognosis and to determine with any kind of certainty a reasonable estimate of his life expectancy.  
Balzekas
, 254 Ill. App. 3d at 534. 

Another instructive case is 
Gariti v. Karlin
, 127 Ill. App. 2d 166, 262 N.E.2d 179 (1970).  In 
Gariti
, the medical witness for the defense made several assumptions on which he based his opinion.  
Gariti
, 127 Ill. App. 2d at 172.  Specifically, the medical witness based his opinion on the assumption that one of the parties involved in the car accident was a diabetic and that he swerved across the center line before the collision.  The court, however, noted that there "was absolutely no evidence in the record on which any expert could properly express an opinion."  
Gariti
, 127 Ill. App. 2d at 172.  The court further reasoned that since the doctor's testimony was not proven, it was "highly speculative and improper."  
Gariti
, 127 Ill. App. 2d at 173. 

Here, Dr. Gurevich presented the following testimony:

   "THE WITNESS: The basis is that as time went by and as the wound maintained, or was being opened, and as the eye structures continued to be protruding, some of those eye vital structures 
perhaps could have been saved
, but as the time went by, that eliminated what 
little chance
 that existed.

* * *

   A. Well, I felt that if the injury has been addressed in a timely manner, 
perhaps
 there was a 
small chance
 that the eye would have been sutured and/or the fact that some of the organs of the eye, the uveal tissue, 
may have been
 reposited into the eye.

* * *

   Q. [Mr. Camarra] With regard to this opinion that you have given Mr. Rabinowitz, that there was a potential of 
twenty percent chance of saving the eye
 had the diagnosis been made on July 3 as opposed to July 7, would you agree with me that that's just a number you 
picked out of the air
? You have 
no basis
 for that number, correct?

   A. Well, to some degree, I would agree with that, but not entirely.

* * *

  Q. Without being able to examine Mr. Reed at the time of the trauma, when it was still fresh, would you agree with me that any opinion you have reached, with regard to the potential for saving his eye, is 
based to a certain degree
 
on assumption and speculation
?

   A. Correct.

* * *

   Q. Prior to Mr. Reed, is it fair that you had never been involved in treating a patient with an extens-- as an extensive a laceration and loss of the contents of the eye as existed with Mr. Reed?

   A. Correct. 

   Q. Okay.  You had no personal experience, prior to Mr. Reed, with that type of a patient?

   A. Correct.

* * *

   Q. In this case, you've given us an opinion without benefit of other experience with this extensive a laceration, without any research work and without any medical literature to support it, fair?

  A. Correct." (Emphasis added.)

There was no evidentiary basis for the assumptions made by the doctor.  Experts cannot base opinions on what may have occurred or what the expert believed might have happened in a particular case.  See 
Schuler v. Mid-Central Cardiology
, 313 Ill. App. 3d 326, 335, 729 N.E.2d 536 (2000), citing 
Dyback v. Weber
, 114 Ill. 2d 232, 244, 500 N.E.2d 8 (1986).  Dr. Gurevich did not demonstrate that his opinions were based on anything more than an educated guess.  He did not have the experience nor did he indicate a reliable, credible foundation for his conclusions regarding the actions the emergency room physicians or the salvageability of plaintiff's right eye.  From his own testimony, Dr. Gurevich lacked the knowledge of the condition of plaintiff's eye when he entered JPH's emergency room and could not present a reliable opinion upon which to base his conclusions.  We agree with the trial court that Dr. Gurevich's testimony is not reliable, and therefore, the court did not abuse its discretion in barring his testimony.

II

Plaintiff contends that Dr. Gurevich's testimony is legally sufficient on the issue of proximate cause.  Plaintiff concedes that "it is more probable than not that the Plaintiff would have lost his eye even if treatment to the Plaintiff's eye had been given on July 3, 1995."  Nonetheless, plaintiff maintains that "the failure of Dr. Mitchell to open the eye, diagnose the condition of the eye and refer the Plaintiff for the appropriate treatment, lessened the effectiveness of treatment."  The issue is whether, under the "lost chance" doctrine, the trial court erred in granting defendants' renewed motion for summary judgment.  

Defendants respond that their renewed motion for summary judgment was properly granted because plaintiff lacked sufficient evidence to prove proximate cause after Dr. Gurevich's opinions were barred.  

The concept of "lost chance" was introduced in 
Northern Trust Co. v. Louis A. Weiss Memorial Hospital
, 143 Ill. App. 3d 479, 493 N.E.2d 6 (1986).  Upon appeal in 
Northern Trust
, the defendant maintained that the evidence could not support the trial court's finding that the hospital's failure to provide a specially trained nurse proximately caused the baby's brain damage.  However, the appellate court noted that there was evidence in the record to support the conclusion that the failure to administer sufficient amounts of oxygen was a substantial factor in contributing to the baby's injuries.  
Northern Trust
, 143 Ill. App. 3d at 488.  The court held that the evidence supported the jury's conclusion that the hospital's failure to provide a specially trained nurse to supervise the nursery proximately caused a delay in treatment and the delay was a substantial factor contributing to her injury.  
Northern Trust
, 143 Ill. App. 3d at 488. 

Plaintiff in the instant case cites to 
Wodziak v. Kash
, 278 Ill. App. 3d 901, 633 N.E.2d 138 (1996), to support his contention that the delay in surgical treatment lessened the chance of saving his right eye.  In 
Wodziak
, the plaintiff's decedent went to a hospital emergency complaining of shortness of breath.  At the hospital, a blocked-throat whistle was diagnosed and decedent was released.  Two days later, at another hospital, doctors discovered a tracheal obstruction.  Emergency surgery was conducted.  During surgery, the patient suffered a stroke and suffered permanent brain damage.  The complaint alleged that the delay in investigating the cause of plaintiff's condition postponed effective treatment and was the proximate cause of the patient's injury.  An expert witness testified that the treating physician's conduct in that case delayed the definitive treatment of plaintiff's condition.  
Wodziak
, 278 Ill. App. 3d at 912.   The court held that the expert testimony was sufficient to establish that the initial treating physician's delay in diagnosis lessened the effectiveness of subsequent treatment.  
Wodziak
, 278 Ill. App. 3d at 912.  Unlike the instant case, the expert in 
Wodziak
 testified to a 
specific
 procedure that was postponed by the negligently delayed diagnosis.  The plaintiff's expert in 
Wodziak
 gave testimony that established that an earlier diagnosis would have provided the plaintiff with a substantial chance of more effective treatment.  
Wodziak
, 278 Ill. App. 3d at 908-09.

Plaintiff also relies on 
Holton v. Memorial Hospital
, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997).  Relative to the "lost chance" doctrine, 
Holton
 indicated that, "To the extent a plaintiff's chance of recovery or survival is lessened by the defendant's malpractice, he or she should be able to present evidence to a jury that the [defendant's] malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery."  
Holton
, 176 Ill. 2d at 119.  In 
Holton
, the testifying doctor indicated that he would have taken a different course of treatment had he been accurately and promptly notified of his patient's progressive paresis.  The plaintiff's expert testified that the condition that plaintiff suffered is one that if diagnosed within 24-hours of the occurrence of paresis, patients often have "'an excellent neurological recovery.'"  
Holton
, 176 Ill. 2d at 103.  The plaintiff's expert testified to a reasonable degree of medical certainty what the preferred treatment for the plaintiff would have been had the doctors been given the opportunity to properly diagnose her condition.  
Holton
, 176 Ill. 2d at 108. 

In contrast, Dr. Gurevich in the instant case could not testify that to a reasonable degree of medical certainty that had JPH emergency room doctors had diagnosed the condition of plaintiff's eye soon after the injury, his eye could have been saved.  In fact, Dr. Gurevich testified that plaintiff's right eye most likely would have been removed regardless of when examination and treatment was rendered.

An instructive case is 
Townsend v. University of Chicago Hospitals
, 318 Ill. App. 3d 406, 741 N.E.2d 1055 (2000).  In 
Townsend
, the defendants were accused of failing to order or perform imaging studies of decedent's abdomen in the emergency room and failing to transfer her to an intensive care unit in light of her worsening condition.  On appeal, the defendants asserted that they were entitled to judgment notwithstanding the verdict because plaintiff failed to present any evidence of proximate cause and that they were entitled to a new trial because of various trial errors.  
Townsend
, 318 Ill. App. 3d at 408.  The appellate court agreed.  
Townsend
, 318 Ill. App. 3d at 408.  The appellate court reasoned that the record
 did not disclose any potential treatment for the decedent's condition and the jury was "left to speculate about proximate cause."  
Townsend
, 318 Ill. App. 3d at 414.  In the court's view, the experts' testimony that "[decedent's] chances for survival would go from 0% to 60% if 'relief' had been provided" did not satisfy the "causation gap."  
Townsend
, 318 Ill. App. 3d at 414-15.  In the instant case, Dr. Gurevich's  testimony that plaintiff may have had a 20% chance of saving his eye had it been examined by JPH emergency room physicians did not provide the necessary nexus between JPH's actions and the subsequent enucleation of plaintiff's right eye.  Essentially, Dr. Gurevich's testimony did not satisfy the causation gap.  

"In order to establish proximate cause, plaintiff's evidence must show to a reasonable degree of medical certainty that the negligent delay in diagnosis lessened the effectiveness of treatment."  
Wodziak
, 278 Ill. App. 3d at 912.  Our analysis establishes that, Dr. Gurevich's testimony, even if it were allowed into evidence, was insufficient to establish proximate cause under the "lost chance" doctrine.

For the foregoing reasons, we affirm the judgment of the trial court barring the opinion of plaintiff's expert witness and granting defendants' motion for summary judgment.  

Affirmed.

McNULTY and TULLY, JJ., concur.