**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230308-U

Order filed December 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| HARRY KATZ and DIANE KATZ, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiffs-Appellants, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| ADVOCATE GOOD SAMARITAN | ) | |
| HOSPITAL; DEAN G. KARAHALIOS, M.D.; | ) | Appeal No. 3-23-0308 |
| MARIONJOY REHABILITATION | ) | Circuit No. 18-L-1294 |
| HOSPITAL and AARON HANYU- | ) | |
| DEUTMEYER, D.O., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Marionjoy Rehabilitation Hospital, | ) | The Honorable |
| | ) | Neal W. Cerne, |
| Defendant-Appellee). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Anderson and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court did not err when it granted summary judgment in favor of the defendant hospital.

¶ 2    The plaintiffs, Harry and Diane Katz, filed a medical malpractice complaint against the defendants, Advocate Good Samaritan Hospital, Dr. Dean G. Karahalios, Marionjoy Rehabilitation Hospital, and Dr. Aaron Hanyu-Deutmeyer[1], seeking damages for certain permanent injuries Harry sustained following a car accident. On appeal, the plaintiffs argue that the circuit court erred when it granted summary judgment in favor of defendant Marionjoy. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Plaintiff Harry Katz was involved in an automobile accident on March 28, 2017. He was transported to Good Samaritan Hospital and was treated for multiple cervical bone fractures, a brain bleed, thoracic fractures, and rib fractures. He also experienced bladder dysfunction. Harry was discharged to Marionjoy for rehabilitation on April 7, where he continued to have difficulty voiding his bladder, among other issues. On April 22, he underwent spinal fusion surgery. The bladder dysfunction he experienced has remained since the accident.

¶ 5    In May 2019, the plaintiffs filed a four-count amended complaint alleging medical malpractice against the defendants. Regarding Marionjoy, Count III alleged that it was negligently responsible for Harry's injuries by (1) "[f]ailing to insure [*sic*] that Plaintiff's fractures of his cervical spine were stable before performing physical therapy on the Plaintiff," (2) "[f]ailing to discontinue therapy after it became apparent that the physical therapy was causing further injury to the Plaintiff," (3) "[f]ailing to appropriately monitor the Plaintiff during physical therapy after the severe injury to Plaintiff's cervical spine," and (4) "[f]ailing to heed the warnings of the Plaintiffs [*sic*] when he complained that his extremities were becoming weaker after physical therapy was started."

_____

[1] Dr. Hanyu-Deutmeyer was later dismissed from the case on motion by the plaintiffs.

¶ 6    Numerous depositions were taken in this case, only one of which is relevant to this appeal. Dr. Sasha Iversen testified that she was a board-certified doctor of physical medicine and rehabilitation (PM & R). While she had not directly examined Harry, she reviewed the records from his time at Good Samaritan and Marionjoy. She confirmed that Harry was admitted as a trauma patient at Good Samaritan after his accident and that a neurosurgeon team consulted with the trauma team while treating Harry. Dr. Iversen was not qualified in either trauma or neurosurgery. She did state that PM & R doctors like herself were trained extensively on spinal cord injuries and how to recognize them.

¶ 7    The neurosurgeons at Good Samaritan treated Harry conservatively, using an Aspen collar. She was not qualified to opine whether that was the correct method of treatment for Harry. Good Samaritan's neurosurgeon team chose to perform a CT scan of Harry's cervical spine, but not an MRI. The CT scan revealed fractures involving the posterior elements of C4 to C6 on the left side and nondisplaced fractures involving the transverse processes of T8 and T9 on the right side. A catheter was also inserted at the hospital.

¶ 8    Dr. Iversen testified that Harry had experienced bladder dysfunction since the accident, including during his time at both Good Samaritan and Marionjoy. She stated that there could have been multiple reasons for Harry's bladder dysfunction, but she concluded that it was due to his spinal cord injury. She stated that Marionjoy's records indicated that Harry had been experiencing numbness and tingling of the fingers on April 7, 9, and 13, 2017. Those symptoms could be explained in part by his spinal cord injury. She opined that he was displaying the symptoms of a spinal cord injury and that Marionjoy failed to recognize those signs and treat him accordingly. Thus, her opinion was that Marionjoy violated the standard of care by failing to recognize Harry's symptoms and "bring it up to a higher level of care." When asked "whether or not it made any

3

difference in Mr. Katz's ultimate outcome," Dr. Iversen admitted that she was not qualified to give that opinion "as far as surgery." She then stated,

"but I think the longer you wait with something pressing on the cord – I mean, that is full on PM&R, you know, knowledge base, you know. We know that if we don't refer somebody in an appropriate time frame that they do lose function because nervous tissue in the brain and spinal cord does not recover. You have to take that pressure off immediately."

¶ 9    The following exchange also occurred during the deposition:

"Q. And you're not offering any opinion on whether or not that [spinal fusion] surgery should have been done from the get-go when Mr. Katz was admitted to Good Sam or shortly thereafter in March of 2017 because you're not qualified to do that because you're not a neurosurgeon, correct?

A. That's right.

Q. And in the same vein you're not qualified to give an opinion as to whether or not earlier neurosurgical intervention would have made a difference in Mr. Katz's outcome?

A. I think we can say that, you know, he deserved the chance and that it is – it is not okay for a rehab doctor to sit on spinal cord injury symptoms because you don't know if the person's spinal cord is going to come back. The neurosurgeon probably would never be able to say if he's going to be able to save somebody's function if they can take the pressure off.

But we do know – even rehab doctors, we know that – that the time – and we tell people this all the time with peripheral nerves. It's like the longer that you wait with the compression on that nerve, the less likely it is that you're going to have function return.

So, you know, while I'm not the neurosurgeon, I am going to say that – you know, that the time that – that it didn't get looked at I think was valuable time. And nobody can say for sure if it would have fully come back or not, but I do think he should have been given that chance."

She also added:

"Nobody can say for sure, yes or no, it would have made a difference or not. I mean, all we have – all we have is the more likely than not, you know, level, which is more likely than not it would have made a difference or not. I don't know if – if surgery – if they did surgery sooner if it would have made a difference. I'm just saying that – what I just said is that on the rehab unit you can't guarantee people that their nerve function comes back but it's – you should definitely not ignore a patient's symptoms."

She concluded that Marionjoy should have sent Harry back to the neurosurgeon earlier and that "[i]t's possible it would have" made a difference in his outcome.

¶ 10　　In December 2022, Marionjoy filed a motion for summary judgment, alleging that the plaintiffs had failed to establish proximate cause between Harry's injuries and Marionjoy's treatment because "no qualified expert has testified that Harry Katz would have had a different medical outcome had it not been for Marionjoy's alleged negligence."

¶ 11　　On March 7, 2023, the circuit court held a hearing on Marionjoy's motion. The court questioned plaintiffs' counsel regarding whether a neurosurgeon's opinion was needed to support a claim that Marionjoy's actions impacted Harry's chance at recovering bladder function. Counsel

said no, that under case law, Dr. Iversen's testimony was sufficient to establish a *prima facie* case of proximate cause. The court further asked, "[s]o are you saying that the question for the jury then is to hear that it was possible that this delay caused more problems, and the question for the jury is did the delay cause more problems or not? Don't we need an expert to say that it did?" Counsel claimed that under case law, it was a question for the jury to decide whether certain alleged negligent conduct reduced the patient's chance of recovery.

¶ 12    In issuing its ruling, the court agreed that Dr. Iversen's testimony was sufficient to indicate that a violation of the standard of care had occurred, but it also found that her testimony did not evidence a connection between Marionjoy's conduct and the injury itself. The court then stated:

> "Her statement later on in the deposition where it says, in essence, everyone deserves a chance, that's more in my mind – I took it more as [a] philosophical, rhetorical issue that everyone deserves a chance. It's not really a medical opinion. When pressed on the issue of a medical opinion as to whether or not it would have made a difference, she opined that she wasn't able to give that, that opinion, which means that there is no – there is no proof of any proximate cause between the actions of Marionjoy and any further injury to Mr. Katz."

The court then granted Marionjoy's motion for summary judgment. After their motion to reconsider was denied, the plaintiffs appealed.

¶ 13                                    II. ANALYSIS

¶ 14    On appeal, the plaintiffs argue that the circuit court erred when it granted summary judgment in favor of Marionjoy. More specifically, the plaintiffs allege that the court erred when it found that the pleadings did not sufficiently establish proximate cause on the part of Marionjoy.

6

¶ 15 Summary judgment may be granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). The purpose of summary judgment proceedings is to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004).

"In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. The use of the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit. However, it is a drastic means of disposing of litigation and, therefore, should be allowed only when the right of the moving party is clear and free from doubt." *Id.* at 43.

We review a circuit court's decision on summary judgment *de novo*. *Id.*

¶ 16 There are three elements that a plaintiff must prove in a medical malpractice action: "(1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) that the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress." *Sunderman v. Agarwal*, 322 Ill. App. 3d 900, 903 (2001).

¶ 17 A plaintiff is not required to prove its case at the summary judgment stage. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). Further, whether proximate cause has been established is typically a question of fact. *Gyllin v. College*

7

*Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 711 (1994). Nevertheless, to survive a defendant's motion for summary judgment, "the plaintiff must present affirmative and positive evidence that a defendant's negligence was arguably a proximate cause of the plaintiff's injuries." *Id.* Absent that affirmative showing, there is no genuine issue of material fact regarding proximate cause. *Id.*

¶ 18      In this case, the plaintiffs allege that Dr. Iversen's testimony was sufficient to establish proximate cause under a "lost chance of recovery" theory.

" 'Lost chance' or 'loss of chance' in medical malpractice actions refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health care problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 111 (1997).

Under this theory, a plaintiff is not required to prove either that (1) he or she would have had a greater than 50% chance of survival or recovery but for the alleged negligence or (2) absent the alleged negligence, the plaintiff would have had a better result. *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 16. The *Holton* court clarified,

"[t]o the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Holton*, 176 Ill. 2d at 119.

¶ 19      *Northern Trust Co. v. Louis A. Weiss Memorial Hospital*, 143 Ill. App. 3d 479 (1986), was recognized by the *Holton* court as the first case to approve the "lost chance" theory. *Holton*, 176 Ill. 2d at 114. In *Northern Trust*, the defendant hospital was found liable for injuries an infant

8

suffered because the hospital failed to provide a certain type of specially trained nurse in its nursery. *Northern Trust*, 143 Ill. App. 3d at 488. In that case, the infant was healthy at birth but suffered brain damage within the 20 hours she was at the hospital. *Id.* at 486. During the birthing process, the delivering doctor noticed that the amniotic fluid contained copious amounts of meconium, which "indicated that the baby had undergone some trauma within the day before delivery." *Id.* at 482. The plaintiffs presented expert testimony that, "to a reasonable degree of medical certainty," meconium aspiration caused the infant's brain damage. *Id.* at 486. Further, that expert testified that under the standard of care, a specially trained nurse would have reported the infant's deteriorating condition 6½ hours earlier than what actually occurred. *Id.* Based on that breach of the standard of care, the expert opined that within a reasonable degree of medical certainty, the infant suffered an increase in morbidity due to the delay in reporting her condition. *Id.* at 487.

¶ 20     The *Holton* court cited *Northern Trust*'s analysis with approval, stating that "[w]e believe the 'reasonable certainty' language referenced above conforms to traditional principles of proximate cause." *Holton*, 176 Ill. 2d at 115.

¶ 21     While *Northern Trust* and *Holton* involved, in relevant part, challenges to jury verdicts (*Northern Trust*, 143 Ill. App. 3d at 486-89; *Holton*, 176 Ill. 2d at 108-11), their reasoning has been applied in the summary judgment context. For example, in *Reed v. Jackson Park Hospital Foundation*, 325 Ill. App. 3d 835, 844-45 (2001), the plaintiffs argued that they presented adequate evidence on proximate cause under the "lost chance" doctrine to survive summary judgment. In discussing the "lost chance" doctrine, the First District emphasized that the expert in question did not testify *to a reasonable degree of medical certainty* that the complained-of treatment decreased the patient's chance of a more favorable outcome:

9

"Dr. Gurevich in the instant case could not testify that to a reasonable degree of medical certainty that had JPH emergency room doctors had [*sic*] diagnosed the condition of plaintiff's eye soon after the injury, his eye could have been saved. In fact, Dr. Gurevich testified that plaintiff's right eye most likely would have been removed regardless of when examination and treatment was rendered." *Id.* at 846.

Thus, the First District found that the expert's testimony was insufficient to establish proximate cause under the "lost chance" doctrine. *Id.* at 847. Accordingly, the *Reed* court upheld the circuit court's grant of summary judgment in favor of the defendants. *Id.* We find the *Reed* analysis instructive.

¶ 22    In this case, the plaintiffs have not presented any evidence to meet the "reasonable certainty" standard that applies in "lost chance" cases. While Dr. Iversen opined that Marionjoy was negligent in that they failed to recognize symptoms of a continued spinal cord injury and refer Harry for higher-level treatment, at no point did she opine that Marionjoy's actions even contributed to Harry's permanent bladder dysfunction. In fact, she testified that she was not qualified to render such an opinion. She even admitted that "[n]obody can say for sure, yes or no, [surgery] would have made a difference or not." Dr. Iversen's testimony did not provide an expert opinion within a reasonable degree of medical certainty like the expert in *Northern Trust*. *Northern Trust*, 176 Ill. 2d at 486-87.

¶ 23    "The existence of proximate cause cannot be established by speculation, surmise, or conjecture." *Gyllin*, 260 Ill. App. 3d at 711. Absent an expert opinion that, to a reasonable degree of medical certainty, Marionjoy's actions contributed to Harry's bladder dysfunction, proximate cause between Marionjoy's actions and Harry's condition is lacking. Under these circumstances, we hold that the circuit court did not err when it granted summary judgment in favor of Marionjoy.

10

See *Reed*, 325 Ill. App. 3d at 847; see also, *e.g.*, *Northern Trust*, 176 Ill. 2d at 486-87; *Holton*, 176 Ill. 2d at 108.

¶ 24                                  III. CONCLUSION

¶ 25          The judgment of the circuit court of Du Page County is affirmed.

¶ 26          Affirmed.