2024 IL App (1st) 232471-U

SIXTH DIVISION
December 20, 2024

No. 1-23-2471

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| MARIA QUINTANA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | |
| WILLIAM CRUIKSHANK, M.D., HINA IQBAL, M.D., | ) | No. 19 L 012023 |
| JENCARE NEIGHBORHOOD MEDICAL CENTER, | ) | |
| OAK LAWN, LLC, and PMR ILLINOIS HOLDING, | ) | The Honorable |
| LLC, | ) | Anthony C. Swanagan, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the circuit court is affirmed. The trial court properly granted summary judgment to the defendants on the issue of proximate cause.

¶ 2                                I. BACKGROUND

¶ 3    Plaintiff Maria Quintana suffered from a number of health issues, including atherosclerosis, or plaque in the vessels in her heart. Because she had type II diabetes and high cholesterol, she was taking a type of medication called a statin, which works by blocking an enzyme the body needs to make cholesterol, thereby reducing the amount of cholesterol in the blood. She had been

prescribed the statin Atorvastatin (commonly known by its brand name, Lipitor), and had been taking it since at least January of 2017, when defendant Dr. Hina Iqbal prescribed it to her. Defendant Dr. William Cruikshank became involved in Quintana's care in March 2017.

¶ 4    Beginning in 2018, Quintana's health started to deteriorate. On March 28, 2018, Quintana saw a doctor to evaluate and manage her chronic medical problems. She was still taking Atorvastatin at the time. She had some complaints about her knee joints due to her osteoarthritis, but presented with no acute symptoms. At her next doctor's visit on April 24, 2018, Quintana continued to complain of knee pain and requested an·injection for chronic arthritis in her knees, but Dr. Iqbal recommended against an injection at that time. At her next visit on May 14, 2018, with Dr. Cruikshank, Quintana was still complaining of knee pain. She was walking unevenly and using a cane, and requested a parking disability placard application. During Dr. Cruikshank's physical examination of Quintana, he noted a loss of muscle in her posterior medial thighs. He ordered a diabetic test to check her blood sugar, x-rays of her hips because her gait was a little bit off, and a vitamin D test. However, he did not order any additional testing because her medical records reflected that she "has used a cane for a long time" and that she had previously been diagnosed with fibromyalgia and osteoarthritis, both of which contribute to decreased movement, more sitting, and less stress on the muscles to maintain the muscle mass. Quintana returned for another visit on May 21, 2018, and stated that she was seeing a chiropractor. Her hip x-rays were consistent with mild degenerative joint disease.

¶ 5    At her next doctor's visit on July 6, 2018, Quintana said that she was having a hard time getting up out of a chair and that she had to use a cane to walk. At this visit, Dr. Cruikshank ordered a creatine phosphokinase (CPK) test. CPK is an enzyme found mainly in the heart, brain, and skeletal muscles of the body. "When the total CPK level is very high, it most often means there

has been injury or stress to muscle tissue, the heart, or the brain." Mount Sinai Staff, Creatine phosphokinase test, Mount Sinai, April 14, 2023 (https://www.mountsinai.org/health-library/tests/creatine-phosphokinase-test). Although Dr. Cruikshank "felt that [Quintana] had symptoms and signs that were consistent with her previously·documented osteoarthritis and fibromyalgia," he ordered the CPK test because "there was maybe a sense that [he] could not attribute all of·this to her previous conditions and her previous documented history." Although Dr. Cruikshank ordered the CPK test on July 6, 2018, it was not performed until July 31, 2018, when Quintana returned for her next appointment. At this visit, Quintana complained of bilateral knee pain as well as weakness in her upper extremities. She said she felt her symptoms were progressively getting worse, and indicated that she was relying more and more on her husband for support.

¶ 6    Dr. Cruikshank received the results of the CPK test on August 1, 2018, which indicated that Quintana's CPK level was well above the normal range. He called Quintana to discuss the results and advised her to stop taking Atorvastatin, because his "working diagnosis" was that she could have a "statin-induced myopathy," that is, muscle fatigue, pain, and weakness caused by statin medication. Because this was beyond his expertise, however, Dr. Cruikshank referred Quintana to a specialist in the area of the muscles and connective tissues to determine what the next steps should be.

¶ 7    Dr. Sana Haseeb, a rheumatologist, started seeing Quintana in November 2019. She diagnosed Quintana with immune-mediated necrotizing myositis, a rare autoimmune disease. She explained that the immune system typically fights off infections, but sometimes it attacks the body's organs, or, in the case of myositis, it attacks the body's muscles. During her deposition, Dr. Haseeb admitted that prolonged statin use can cause immune-mediated necrotizing myositis and

that the results from Quintana's August 28, 2018, muscle biopsy were consistent with statin-induced myositis. Dr. Haseeb testified that it was more probably true that not that Quintana's statin use was a cause of her myositis. However, when she was asked if stopping the statins a month earlier would have made any difference "in terms of the prognosis or the long-term effects of this disorder," she responded, "I don't think so." And when she was asked if "starting therapy sooner [would] have any impact on the long-term outcome," she responded, "I don't know."

¶ 8      On October 30, 2019, Quintana filed a complaint against Dr. Cruikshank, Dr. Iqbal, Jencare Medical Center Oak Lawn, LLC, and PMR Illinois Holding, LLC (collectively, Defendants). The complaint alleged that Defendants deviated from the standard of care when they (1) failed to timely order laboratory tests for CPK; (2) failed to perform a full work up to diagnose the cause of Quintana's pain, weakness and muscle loss; and (3) failed to timely discontinue Atorvastatin or appreciate the seriousness of Quintana's symptoms. It also alleged that as a result of the negligent acts or omissions of Defendants, Quintana suffered injuries and damages. The parties agree that Quintana's claim "falls squarely within the lost chance doctrine."

¶ 9      Quintana disclosed family medicine practitioner Dr. Kenneth Nelson, MD, as an expert witness on the standard of care. During his deposition on December 20, 2022, Dr. Nelson opined that "[i]n this case, the standard of care required that a [CPK test] be ordered in May 2018." He based his opinion on the fact that Quintana displayed muscle atrophy in her thigh, but also "on the history [Quintana] gave of weakness, knee pain, and atrophy." He stated that the "one opinion" he had relating to causation was that if Quintana had been given a CPK test on May 14, 2018, instead of July 31, 2018, "her outcome in a number of different areas would have been better[.]" He said, "[s]ooner diagnosing, sooner stopping this would have made a difference in the outcome" and that

"if you stop the statin sooner, you might prevent the inflammation[.]" He deferred all other opinions regarding causation to Dr. David John, MD, Quintana's causation expert.

¶ 10    In his deposition, Dr. John explained that was a rheumatologist who was retained to opine on causation issues. After reviewing Quintana's medical records, Dr. John was asked if it was "more likely true than not true that Maria Quintana's statin use was a cause of her myopathy?" He responded, "I think it's very possible that it is a component of her illness, her myopathy/myositis presentation. I think it's – it's very possible that's true. I don't think anyone's going to be able to say that it is definitively true or not true." He was then asked, "what is your opinion as to the likeliness that statins were in fact a cause or a contributing cause to Miss Quintana's myopathy? I have to know which is more likely, that it was a contributing cause or that statins were not a contributing cause?" Dr. John responded,

> "I pause because it is such a complex issue and there [are] so many factors involved here. I also know that medicine is an inexact science. I think that it is very possible that statins were a problem, part of the problem, not the whole problem. I don't believe it's the whole problem here. Was part of the problem that caused her acutely to decompensate. Whether it is more or less than 50 percent I can't say with certainty. I do think that I would consider it as a possible contributing factor."

He was then asked, "So, fair to say given what you have just testified to, you are unable to say with greater than 50 percent certainty whether statins caused or contributed to Miss Quintana's myopathy?" He responded, "I don't think it's possible for me or anyone else to say that." Quintana's counsel then asked Dr. John if it was "very likely" that statin use was a cause of Quintana's symptoms. Dr. John replied that it was a "significant possibility." Quintana's counsel

then asked if it was "more probably true than not true that the statin was a contributing cause to her myositis." Dr. John responded,

> "I am trying to find a way to phrase this that is what I feel and what I feel to be true. There is a possibility, a significant possibility, that statins played a point in triggering her illness. It is not definite. And what I am having trouble with is this 50 percent thing. Because it is possible doesn't mean that it is more than 50/50 to me. And so at the same time there's no way it could be for anybody. So, it is a possibility, a likely possibility that was a factor in her initial presentation. To say – I'm having trouble saying the more than 50/50 percent because I don't know that. And I don't think anybody would know that. So, I don't know – that's the best answer that I can give."

Dr. John was also asked if he thought that discontinuing Atorvastatin in May of 2018 instead of August 2018 would have made any difference in Quintana's outcome and "reduced" her muscle loss and weakness. He replied,

> "Possibly. When you have an immune response, it gets kicked in, gets triggered. It can be variable in how long that immune response stays active. Continuing to give the patient the offending substance that triggered it doesn't make any sense and could probably many times prolong the illness. But sometimes once it's triggered, it just goes wild for as long as it wants despite stopping the medication. So, it's a variable – the answer is not black and white."

When Dr. John was asked if he agreed with Dr. Haseeb's opinion that stopping Atorvastatin sooner would not have made any difference in Quintana's outcome, he stated,

> "I'm not sure – with these kind of diseases and their complex triggers that are very poorly understood in medicine at this point – we are making progress – stopping it earlier would

take away the offending antigens, stimulus site, earlier might have slowed down or shortened the illness, but often once it's started in motion, that doesn't seem to matter.· So, the answer is she's possibly right and I don't disagree with her, but I'm not 100 percent sure of that."

Dr. John was also asked if he "agree[d] *** that that if the statins had been stopped or canceled within a month or two earlier than they were, it would be speculation as to whether or not that would have improved Miss Quintana's long-term prognosis?" He responded, "Correct."

¶ 11    Defendants moved for summary judgment, arguing that Quintana "cannot prove that Atorvastatin was the proximate cause of her alleged injury" and that "running tests and taking [her] off Atorvastatin in May 2018, as opposed to August 2018, would have affected her outcome." Defendants argued that because "[n]one of [Quintana's] experts have opined, to a reasonable degree of medical certainty, what impact, if any, the earlier discontinuation of Atorvastatin would have made on [Quintana's] deteriorating condition," summary judgment on the issue of proximate cause should be granted in their favor. Defendants noted that Quintana's causation expert, Dr. John, stated that "it would be speculation" to say that if the statins had been stopped or canceled a month or two earlier than they were, that would have improved Quintana's long-term prognosis.

¶ 12    In her response to Defendants' motion for summary judgment, Quintana argued that the testimony of her retained experts and treating physicians was "sufficient to establish a causal connection and proceed to trial." She pointed to Dr. John's testimony that it was "possible" that discontinuing Atorvastatin sooner would have reduced muscle weakness and argued that he and her treating physicians provided testimony "showing that it is 'more probably true than not true' that the Defendants failure to timely take [her] off Atorvastatin was a proximate cause of [her]

injuries; especially where two of [her] treating physicians diagnosed her with statin-induced myopathy." (Emphasis omitted.)

¶ 13    In reply, Defendants argued that Quintana "cannot prove that running tests and taking [her] off Atorvastatin in May 2018, as opposed to August 2018, would have made any difference in what occurred." They explained that "[t]he problem with that claim is that [Quintana's] experts couldn't establish that something being done ten weeks sooner would have more-likely-than-not made any difference to [Quintana's] alleged injuries."

¶ 14    At a hearing on Defendants' motion for summary judgment, the court noted that "[t]o establish proximate cause, a plaintiff must show that defendant's negligence more probably than not caused plaintiff's injury. Such proof must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." Granting Defendants' motion for summary judgment, the court stated that "[t]he negligence alleged here was not the administration of atorvastatin period as the parties know. That wasn't the claim. The claim was the continued administration of atorvastatin for the period after May 2018 when [Quintana] presented to the Defendants with some physical symptoms that showed muscle weakness that more than likely, according to several sources, was caused by atorvastatin." However, the court explained that "there isn't enough evidence *** to allow a reasonable juror to find that, not the Atorvastatin administration in general, but its continued administration from May of 2018 to August of 2018," was the proximate cause of Quintana's injuries.

¶ 15    The trial court denied Quintana's motion to reconsider, and Quintana timely appealed.

¶ 16                                    II. ANALYSIS

¶ 17    Quintana argues that the trial court erred in granting summary judgment to Defendants on the issue of proximate cause. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2024); *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). To determine whether a genuine issue of material fact exists, we must construe the evidence against the movant and in favor of the nonmoving party. *Shicheng Guo v. Kamal,* 2020 IL App (1st) 190090, ¶ 17. We review a grant of summary judgment *de novo. Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 292 (2008).

¶ 18    In a medical malpractice action, the plaintiff must prove: (1) the proper standard of care by which to measure the defendant's conduct; (2) a negligent breach of that standard of care; and (3) resulting injury proximately caused by the defendant's negligence. *Seef v. Ingalls Memorial Hospital,* 311 Ill. App. 3d 7, 15 (1999). While proximate cause must be established by expert testimony to a reasonable degree of medical certainty and is "ordinarily a question of fact for the jury" (*Wiedenbeck*, 385 Ill. Appl. 3d at 292-93), a plaintiff must present evidence to prove that the defendant's negligence "more probably than not" caused her injuries. *Holton v. Memorial Hospital,* 176 Ill. 2d 95, 111 (1997). "The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause." *Susnis ex rel. Susnis v. Radfar*, 317 Ill. App. 3d 817, 827 (2000); see also *Aguilera v. Mount Sinai Hospital Medical Center,* 293 Ill. App. 3d 967, 975 (1997) (quoting *Pumala v. Sipos,* 163 Ill. App. 3d 1093, 1099 (1987)) (the causal connection must not be "contingent, speculative, or merely possible"); *Wiedenbeck*, 385 Ill. App.

3d at 293 ("conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant"). We disagree with Quintana's contention that the mere possibility of a causal connection is sufficient. She relies on *Damron v. Micor Distributing, Ltd.*, 276 Ill. App. 3d 901, 911(1995), where the court upheld the jury's verdict in favor of defendant where the defendant's expert opined that the wrench had been properly manufactured and that the "only possibility" for the wrench's failure is that it had a pre-existing crack in it that allowed it to fail at a much lower load, which contradicted the plaintiff's theory that the unreasonably dangerous condition of the wrench was the proximate cause of plaintiff's injury. However, in context, it was clear that the defendant's expert opinion was based on probability and not simply a possibility when he opined that the "only possibility" was that the wrench had a pre-existing crack in it.

¶ 19 " 'Lost chance' or 'loss of chance' in medical malpractice actions refers to the injury sustained by a plaintiff whose medical providers are alleged to have negligently deprived the plaintiff of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff." *Holton,* 176 Ill. 2d at 111. The same "more probably than not" causation standard applies to cases premised on the lost chance doctrine. See *Bailey v. Mercy Hospital and Medical Center*, 2021 IL 126748, ¶ 50 ("the loss of chance doctrine comports with the traditional proximate cause standard" and "requires a plaintiff to prove that defendant's negligence more probably than not caused plaintiff's injury") (internal quotations and citations omitted); *Holton v. Memorial Hospital*, 176 Ill. 2d at 120 ("the loss of chance concept, when properly analyzed, does not relax or lower plaintiffs' burden of proving causation").

¶ 20 To show a genuine issue of material fact regarding causation, Quintana needed to present evidence that Defendants' alleged negligence "proximately caused the increased risk of harm or

lost chance of recovery." *Vanderhoof v. Berk,* 2015 IL App (1st) 132927, ¶ 61 (quoting *Holton*, 176 Ill. 2d at 119). To defeat summary judgment, Quintana needed to offer some evidence that Defendants' failure to discontinue medication and order a CPK test in May of 2018 instead of August of 2018 more probably than not "lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to [her]." *Holton,* 176 Ill. 2d at 111.

¶ 21    Quintana did not produce evidence to create a genuine issue of material fact on the causation element of her medical malpractice claim. Although Quintana's treating rheumatologist Dr. Haseeb opined that it was "was more probably true that not true" that Quintana's statin use was a cause of her myositis, she stated that she "d[id]n't think" that stopping the statins a month earlier would have made any difference "in terms of the prognosis or the long-term effects of this disorder," and that she "d[id]n't know" if "starting therapy sooner [would] have any impact on the long-term outcome." Quintana's causation expert, rheumatologist Dr. John, gave a similarly equivocal response. Although he averred that it was "possibl[e]" that stopping Avortastatin a month or two sooner could have reduced Quintana's muscle loss and weakness, he added that "sometimes once [the illness is] triggered, it just goes wild for as long as it wants despite stopping the medication. So, it's a variable – the answer is not black and white." Ultimately, he agreed that it would be "speculation" to say that Quintana's long-term prognosis would have improved if the statins had been stopped a month or two earlier. Taken together, their testimony is insufficient to create a genuine issue of material fact that Defendants' actions proximately caused Quintana's injuries. See *Susnis,* 317 Ill. App. 3d at 827 ("The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause.")

¶ 22    Quintana next argues that Dr. Cruikshank's testimony supports a finding of proximate cause because he testified that his "working diagnosis" was that Quintana was suffering from a

"statin-induced myopathy." However, whether statins ultimately contributed to Quintana's medical condition has no bearing on the causation issue here, which is whether Defendants' failure to order a CPK test and discontinue statins in May of 2018 instead of August of 2018 more probably than not lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to Quintana.

¶ 23    Quintana then argues that Dr. Nelson's testimony also supports a finding of proximate cause. But Dr. Nelson, Quintana's standard of care expert, did not opine that Defendants' negligence "lessened the effectiveness of treatment" or "increased the risk of an unfavorable outcome" to Quintana either. *Holton,* 176 Ill. 2d at 111. Although he opined that the long-term use of a PPI in combination with a statin contributed to Quintana's condition, this has no bearing on the proximate cause issue here. And although he opined that if Quintana had been given a CPK test several months earlier, "her outcome in a number of different areas would have been better," and that "[s]ooner diagnosing, sooner stopping [the statin] would have made a difference in the outcome," he provided no basis for these conclusions. See *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 974 (1997) ("When there is no factual support for an expert's conclusions, the conclusions alone do not create a question of fact."); *Northern Trust Co. v. University of Chicago Hospitals and Clinics,* 355 Ill. App. 3d 230, 245 (2004) (an " 'expert's naked opinion' with respect to proximate cause cannot sustain a jury's verdict"). In the absence of a medical basis, his testimony that "sooner diagnosing, sooner stopping this would have made a difference in the outcome" was simply insufficient to defeat Defendants' motion for summary judgment. See *Wiedenbeck,* 385 Ill. App. 3d at 296, 299 (finding "sufficient evidence of proximate cause *** lacking" even though an expert testified that if treatment "would have been sooner, *** sooner would have been better" because "no expert evidence was offered to a reasonable degree

of medical certainty that [the doctor's] alleged deviation caused [plaintiff's] injuries or lessened the effectiveness of her medical treatment")..

¶ 24    Moreover, Dr. Nelson admitted that he would "defer to Dr. John on the issue of rheumatology" and leave any causation opinions to Dr. John, who averred that it would be "speculation" to say that Quintana's long-term prognosis would have improved if the statins had been stopped a month or two earlier. None of Quintana's experts or treating physicians testified, to a reasonable degree of medical certainty, that Defendants' failure to order a CPK test and discontinue statins a few months sooner "lessened the effectiveness of treatment or increased the risk of an unfavorable outcome" to Quintana. *Holton,* 176 Ill. 2d at 111.

¶ 25    The cases cited by Quintana are inapposite. In *Walton v. Dirkes*, 388 Ill. App. 3d 58, 67-68 (2009), the court upheld a jury's verdict in favor of plaintiff after finding that the plaintiff "offered evidence to a reasonable degree of medical certainty that defendant's negligent failure to order a [blood test] *** resulted in a delayed diagnosis *** and lessened the effectiveness of [the patient's] medical treatment" where the plaintiff's expert testified about how the patient would have been treated if a blood test had been ordered earlier and explained that if the patient's condition had been diagnosed earlier, "they would have had time to remove some of the white blood cells *** and they would have had time to treat him". In *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶¶ 35, 73, the court upheld the jury's verdict in favor of the plaintiff where expert testified that "the failure to timely administer [a treatment to remove the patient's blood from his body in order to separate the plasma from the rest of his blood] also contributed to [the patient's] death" and opined that if the treatment had been administered in a timely manner, the patient's chances for survival would have been "greater than 50 percent". In *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶¶ 7-9, 22, 24, the court found that the expert's testimony was "sufficient to

establish a *prima facie* case of proximate causation under a lost chance of recovery theory, and [wa]s therefore sufficient to withstand a motion for directed verdict on the issue of causation" where the expert "pointed to specific treatment procedures (*i.e.,* radiation and chemotherapy) that were delayed by [the doctor's] negligent failure to diagnose [the patient's] cancer in June 2000, thereby increasing the risk of death and decreasing [the patient's] chances of survival". In *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶¶ 22, 68, the court upheld the jury's verdict in favor of plaintiff on the issue of proximate cause where the expert "concluded, to a reasonable degree of medical certainty, that [the doctor's] transection of [the patient's] common bile duct, and nothing else, caused the bile leak and sepsis that eventually led to his death". Therefore, the trial court's decision to grant summary judgment to Defendants was proper.

¶ 26                                    III. CONCLUSION

¶ 27    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 28    Affirmed.